IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-21659-CIV-GOLD/O'SULLIVAN

DELLACASA, LLC,

                    Plaintiff,

vs.


JOHN MORIARTY & ASSOCIATES
OF FLORIDA, INC., a Massachusetts
corporation and ITALKITCHEN,
INTERNATIONAL, INC., a Florida corporation,

             Defendants.


and


TRG - Sunny Isles V, Ltd.

              Defendant/Intervenor

_____/

## **ORDER**

THIS MATTER is before the Court on Plaintiff's Motion for Preliminary Injunction

and Incorporated Memorandum of Law (DE # 2, 6/27/07) (hereinafter "Motion for

Preliminary Injunction"). This matter was referred to United States Magistrate Judge

John J. O'Sullivan by the Honorable Alan S. Gold (DE # 10, 3/15/07). The parties

consented to magistrate judge jurisdiction for final disposition of the instant motion. See

Consents (DE # 35, 8/7/07; DE# 75, 10/10/07; DE # 77; 10/10/07; DE# 139, 11/9/07).

Having carefully considered this motion, the responses and replies thereto, the court file

and applicable law and the testimony, evidence and argument presented during the

hearing on December 11-13, 2007 and January 7-9, 2008, it is

**ORDERED AND ADJUDGED** that the plaintiff's Motion for Preliminary Injunction

(DE # 2, 3/17/07) is **DENIED**.

## PROCEDURAL BACKGROUND

**1.     The Parties**

On June 28, 2007, the plaintiff filed its Complaint (DE# 1) against defendant

John Moriarty & Associates of Florida, Inc. (hereinafter "JMAF"). The Complaint alleged

the following causes of action against JMAF: (1) Copyright Infringement of the Sales

Center Cabinetry (Count I); (2) Copyright Infringement of the Condominium Cabinetry

(Count II); (3) Unjust Enrichment (Count III) and (4) Permanent Injunctive Relief (Count

IV).

On October 5, 2007, TRG - Sunny Isles V, Ltd. (hereinafter "TRG" or "owner")

filed its Emergency Motion to Intervene (DE# 73, 10/5/07). On October 10, 2007, the

Court issued an Order (DE# 81) permitting TRG to intervene in this lawsuit.

On October 11, 2007, the plaintiff moved for leave to amend its complaint to add

Italkitchen International, Inc. (hereinafter "Ital") as a defendant in this lawsuit. On

October 12, 2007, the Court granted the plaintiff's motion. The Amended Complaint

(DE# 87, 10/15/07) no longer alleged copyright infringement for the sales center

cabinetry against JMAF (Count I of the original complaint). With respect to JMAF, the

Amended Complaint alleged Copyright Infringement (Count I) and Contributory

Copyright Infringement (Count II) as to the condominium cabinetry and Unjust

Enrichment (Count III) and Breach of Contract (Count IV). As to Ital, the Amended

Complaint alleged Copyright Infringement (Count V) and Unjust Enrichment (Count

2

VII).[1] As to both defendants, the plaintiff sought Permanent Injunctive Relief (Count IV).

**2.      Preliminary Injunction Briefs**

The plaintiff filed the instant Verified Motion for Preliminary Injunction (DE # 2) on June, 28, 2007. Defendant JMAF filed its response in opposition on July 18, 2007. See Defendant John Moriarty & Associates of Florida, Inc.'s Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction (DE# 18). The plaintiff filed its reply memorandum on October 15, 2007. See Plaintiff's Reply Memorandum of Law in Further Support of Plaintiff's Motion for Preliminary Injunction (DE# 91).

On October 24, 2007, TRG filed its response in opposition to the plaintiff's motion for preliminary injunction. See TRG-Sunny Isles V, Ltd.'s Memorandum of Law in Opposition to Plaintiff's Verified Motion for Preliminary Injunction (DE# 107, 10/24/07). Ital filed its response to the plaintiff's motion for preliminary injunction on November 5, 2007. See Defendant Italkitchen[ ] International, Inc.'s Memorandum of Law in Opposition to Plaintiff's Verified Motion for Preliminary Injunction (DE# 133, 11/5/07). The plaintiff filed Plaintiff's Reply Memorandum of Law to TRG's Response Memorandum of Law and in Further Support of Plaintiff's Motion for Preliminary Injunction (DE# 135) on November 15, 2007 and Plaintiff's Reply Memorandum of Law to Ital's Response Memorandum of Law and in Further Support of Plaintiff's Motion for Preliminary Injunction (DE# 160) on November 29, 2007.

The undersigned also permitted the parties to file bench memoranda. On December 4, 2007, the plaintiff filed Plaintiff, Dellacasa, LLC's Bench Memorandum

---

[1] This count was improperly numbered in the Amended Complaint.

(DE# 165), JMAF filed John Moriarty & Associates of Florida, Inc.'s Bench Memorandum for Hearing on Plaintiff's Verified Motion for Preliminary Injunction (DE# 163), Ital filed Italkitchen International, Inc.'s Bench Memorandum (DE# 161) and TRG filed TRG-Sunny Isles V, Ltd's Bench Memorandum for Hearing on Plaintiff's Verified Motion for Preliminary Injunction (DE# 162).

**3.      Preliminary Injunction Hearing**

On December 11-13, 2007 and January 7-9, 2008, the undersigned held an evidentiary hearing on the Verified Motion for Preliminary Injunction (DE # 2, 6/28/07). During the evidentiary hearing, the parties presented witnesses and the undersigned admitted exhibits into evidence. The plaintiff called the following witnesses: Dellacasa's corporate representative Tim Lillis; JMAF's project executive Robert Nordling; Ital's president Ted Platon (via deposition); Ital senior designer Laura Rivas (via deposition); Ital designer Gustavo Arrastia (via deposition); JMAF project engineer Sharon Wood (via deposition) and plaintiff's expert David Linzer.

The defendants presented testimony from the following witnesses: the plaintiff's expert David Linzer (via deposition); the plaintiff's principal Paolo Dellacasa (via deposition); Ital designer Gustavo Arrastia; Ital senior designer Laura Rivas; the defendants' expert Shelly Siegel; architect Jose Suarez; Ital's president Ted Platon (via deposition); Sally Sawh, the plaintiff's general counsel and Paolo Dellacasa's wife (via deposition); TRG's corporate representative Joyce Bronson and Tim Lillis (via deposition).

**4.      Additional Memoranda**

Prior to the conclusion of the evidentiary hearing, Ital filed Italkitchen International, Inc.'s Motion for Judgment on Partial Findings and Incorporated Memorandum of Law (DE# 207, 1/4/08). In its motion, Ital argued that the plaintiff failed to establish that Ital had access to the actual copyrighted drawings. The undersigned denied Ital's motion on January 7, 2008 but permitted the parties to brief the issues raised in the motion. See Order (DE# 210, 1/7/08). On January 9, 2008, the plaintiff filed Dellacasa's Memorandum in Response to Italkitchen's Motion for Judgment on Partial Findings (DE# 215, 1/9/08). Ital filed its response on January 14, 2008. See Italkitchen International, Inc.'s Reply Memorandum to Dellacasa, LLC's Response to Italkitchen's Motion for Judgment on Partial Findings (DE# 219, 1/14/08).

The Plaintiff filed its Memorandum of Law Regarding Ebay v. Mercexchange, LLC and the Admissibility of Hearsay at a Preliminary Injunction Hearing (DE# 214) on January 9, 2008. TRG filed TRG's Response to Dellacasa's Memorandum of Law Regarding Ebay v. Mercexchange, LLC and the Admissibility of Hearsay at a Preliminary Injunction Hearing (DE# 220) on January 15, 2008. On January 18, 2008, the plaintiff filed Plaintiff's Surreply Memorandum of Law to Ital's Motion for Judgment on Partial Findings (DE# 221).

**FINDINGS OF FACT**

**1.      The Plaintiff**

Dellacasa, LLC (hereinafter "the plaintiff") designs kitchens and baths. The plaintiff specializes in European or Italian style kitchens. Italian kitchens have a modern, horizontal look generally consisting of sleek, clean lines. Italian kitchens are both

aesthetic and functional. The plaintiff's product is treated as a system of furniture rather than cabinetry. There are no features that are indispensable to creating an Italian kitchen.

In South Florida, there are numerous companies that provide high-end Italian or European style kitchens to the luxury condominium market. The plaintiff has designed numerous kitchens and baths for luxury condominium projects. The plaintiff worked on 12 or 14 projects for TRG or a TRG affiliate. JMAF was the general contractor on some of these projects.

**2.      Ital**

Ital is a direct competitor of the plaintiff. Ital designs and installs cabinetry and counter tops. In the past three years, fifty percent of Ital's business has consisted of high-end condominiums. Ital has worked with TRG (or a TRG affiliate) and JMAF on other projects.

Like the plaintiff, Ital does not manufacture its own products.  Ital's products are manufactured in Italy based on Ital's specifications and are shipped to Ital for assembly and installation. Ital's manufacturing process differs from the plaintiff's and impacts the way Ital designs its shop drawings.

**3.      The General Contract**

TRG - Sunny Isles V, Ltd. (hereinafter "owner" or "TRG") is the owner of the Trump Tower project. On July 18, 2005, TRG hired JMAF as the general contractor on the Trump Tower project. The general contract between TRG and JMAF states, in pertinent part:

The Drawings, Specifications, and other similar or related documents and

6

copies thereof are furnished to the Contractor for the purpose of performing the Work and are, and shall remain, the property of the Owner. Neither the Contractor nor any Subcontractor, or material or equipment supplier shall own or claim a copyright in the Drawings, Specifications, and other similar or related documents, and **Owner will retain all common law, statutory, and other reserved rights, in addition to the copyright (including, without limitation, the right to create derivative works therefrom)**. All copies of such documents shall be returned to the Owner upon Completion of the Work.

<u>See</u> General Contract, ¶ 1.1 (DE# 162 at Exhibit 2, 12/4/07) (emphasis added).

The terms "drawings" and "specifications" are defined by the general contract. Paragraph 2 of the general contract states that: "Drawings, which are identified in Exhibit 1-A to the Agreement, and which have been signed by the parties as of the date hereof (such Drawings as the same may be further revised from time to time with the approval of the parties hereto are herein referred to as 'Drawings' . . . )." <u>Id.</u> at  ¶ 2. Exhibit 1-A is followed by a list of drawings by various disciplines including architectural, civil, mechanical, plumbing and structural. The plaintiff's shop drawings are not included in this list.

The general contract further provides that "Specifications, which are identified in Exhibit 1-B to the Agreement, the first and last pages of which have been signed by the parties as of the date hereof (such Specifications, as the same may be further revised from time to time with the approval of the parties hereto are herein referred to as 'Specifications' . . . )." <u>Id.</u> at ¶ 3.  Exhibit 1-B includes "Kitchen C[a]binets/Bathroom Vanities" as specifications and is followed by the appliance package and the plaintiff's May 2, 2005 proposal.

4. **The Trump Tower Project**

The Trump Tower project consists of three towers on a podium: Trump Tower I, Trump Tower II and Trump Tower III. Each tower has 42 floors and 271 units. The units in the towers have various layouts: "A", "B", "C", "C" modified, "D," "D" reverse and "E." The price of the units range from $520,000 to over $2.9 million.

5. **Architectural Plans**

The building's design intent originates from the owner and the architect. The architect designs the floor plans for the kitchens, the baths, the living rooms and the entire layout of the units. The architectural plans do not show elevations. They show the placement of the appliances selected by the owner. In designing the layout of a unit, the architect considers the applicable codes and regulations, handicap clearances, vertical plumbing rises and the distances between cabinets. These factors impact the location of the sink and appliances within a kitchen and the location of bathroom sinks. The owner has final say in approving a unit layout.

The architect is ultimately responsible for code compliance. If a change was made in the location of an appliance, the architect would have to prepare a new set of architectural plans because at the end of the project, the architect must certify that the structure, as built, was in accordance with his plans. A preliminary set of architectural drawings would take about four months to prepare.

6. **The Plaintiff's Proposal for Trump Tower I**

On March 31, 2005, the plaintiff submitted a proposal to JMAF for the cabinetry work on the Trump Tower I project. The proposal contained some specifications concerning the scope of work the plaintiff would perform on the project. Some of the

specifications in the plaintiff's proposal became part of the subcontract between the plaintiff and JMAF. <u>See</u> Dellacasa Subcontract, Art. 4, ¶ 4.2 (DE# 162 at Exhibit 1, 12/4/07). The plaintiff does not claim a copyright over these specifications.

In its proposal, the plaintiff recommended using its own installation service. It did not require that the plaintiff install the cabinetry. Subsequent revised proposals contained this recommendation concerning installation. In its proposal, the plaintiff did not indicate that it would retain ownership rights over the shop drawings or that it was otherwise restricting JMAF's use of the shop drawings.

**7.      The Plaintiff's Subcontract for Trump Tower I**

On January 11, 2006, JMAF hired the plaintiff to "supply and install all kitchen, bath and laundry room cabinets . . . and cabanas" for the Trump Tower I project. <u>See</u> Dellacasa Subcontract, Art. 4, ¶ 4.2 (DE# 162 at Exhibit 1, 12/4/07). The subcontract between JMAF and the plaintiff states, in pertinent part, that:

> The Contract Documents for this Subcontract consist of this Agreement and any Exhibits attached hereto, **the Agreement between the Owner and Contractor dated as of 7/18/2005**, the Conditions of the Contract between the Owner and Contractor (General, Supplementary, and other Conditions), the Drawings, the Specifications, all addenda issued prior to and all Modifications issued after execution of the Agreement between the Owner and Contractor and agreed upon by the parties to this subcontract. **These form the Subcontract, and are as fully a part of the Subcontract as if attached to this Agreement or repeated herein** (except as otherwise specified in Article 13 hereof).

<u>See</u> Dellacasa Subcontract, Art. 1, ¶ 1.1 (DE# 162 at Exhibit 1, 12/4/07)(emphasis added). Article 1.2 of the subcontract provides that: "Copies of the above documents, which are applicable to the Work under this Subcontract, shall be furnished to the Subcontractor upon his request. An enumeration of the applicable Contract Documents

9

appears in Article 15." Id. at ¶ 1.2. The plaintiff did not request a copy of the documents referenced in Article 1.2 other than in connection with this lawsuit.

Article 4.2 of the subcontract contains the scope of work. It takes into account the subcontractor's proposal and the owner's requirements. JMAF used the scope of work as a framework to ensure that it received the services and products it paid for. The scope of work in the plaintiff's subcontract included the following:

- A rolling island;

- Kitchen cabinets with a total height of seven to eight feet. The wall cabinets coordinated with varying wall heights;

- Recessed toe-kicks in master bath cabinets as constructed in the model at the sales center;

- All base cabinets with at least one drawer where applicable otherwise same as the model at the sales center;

- Furnish and prep tall cabinet to receive an oven, a microwave and coffee maker where applicable in each kitchen;

- Supply cutlery insert in each unit kitchen same as sales center;

- Coordinate hood cabinet and grille for appliance and duct installation;

- Upper cabinets and pantry units to include tempered glass doors (this specification was later removed by the owner);

- Two pull out baskets underneath the kitchen sink and cook top in each unit; and

- Furnish and install lazy susan or half lazy susan where possible (this specification was later removed by the owner).

See Dellacasa Subcontract, Art 4, ¶ 4.2 (DE# 162 at Exhibit 1, 12/4/07). Thus, the plaintiff was contractually obligated to include these features in its cabinetry design.

8.     **Shop Drawings**

When a subcontractor submitted shop drawings, JMAF would review the shop drawings by comparing them to the architectural drawings and the scope of work to ensure that the subcontractor was not leaving anything out. After reviewing the shop drawings, JMAF would then set up a coordination meeting between the subcontractor, the architect and the owner to discuss the shop drawings.

JMAF held coordination meetings with its cabinetry subcontractors at the beginning of every job to ensure that all the cabinetry designs were approved by the owner and the architect and that the appliances were correctly reflected in the shop drawings. The architect reviewed the shop drawings for the design intent, i.e. the actual layout of the cabinets, and to ensure code compliance. The shop drawings, including their artistic effect, were subject to final approval by the owner.

After the shop drawings were approved, JMAF would distribute the shop drawings to other trades working on the project including the counter top supplier, the flooring subcontractor, the plumber, the engineer and the drywall installer.  It was industry standard to distribute shop drawings to other trades. These trades used the shop drawings to perform their work. JMAF controlled the distribution of shop drawings to other subcontractors. The shop drawings were not shown to prospective buyers or units owners.

Pursuant to the subcontract, the plaintiff submitted its shop drawings to JMAF for approval. The plaintiff typically submitted six sets of shop drawings to JMAF. All of the plaintiff's shop drawings contained the following notice: "The designs and drawings are the copyrighted property of Dellacasa, LLC and may not be reproduced without the

11

consent of Dellacasa, LLC." The owner, the architect and JMAF would make changes to the plaintiff's shop drawings. The plaintiff revised its shop drawings based on these changes.

On October 25, 2006, the plaintiff submitted an Application and Certificate for Payment to JMAF which included a request for $30,000.00 for shop drawings. JMAF paid the amount requested ($30,000.00) minus a 10% retainage[2] for a total of $27,000.00.

**9.    Ital's Subcontract for Trump Tower II and III**

The plaintiff also bid on Trump Tower II and III. Ital was hired for the Trump Tower II and III projects on November 28, 2006. At the time it was hired, Ital had not prepared its shop drawings for the Trump Tower project. JMAF did not award Trump Tower II and III to the plaintiff because JMAF was having trouble with the plaintiff's delivery and installation of the cabinetry on other projects. The plaintiff learned that Ital had been awarded the cabinetry work for the Trump Tower II and III projects in December 2006.

The scope of work in Ital's subcontract with JMAF was similar to the scope of work in the plaintiff's subcontract. Common features included:

- Install a rolling island;

- Total height of kitchen cabinets to be eight feet;

- Master bath cabinets to be wall hung with recessed toe-kick at each box as constructed in the sales center model;

---

[2] It was typical for the general contractor to retain 10% until the completion of the job.

- All base cabinets to have at least one drawer where applicable otherwise same as the sales center;

- Furnish and prep tall cabinet to receive oven, microwave and coffee maker where applicable in each kitchen;

- Supply cutlery insert in each unit kitchen same as sales center model;

- Base cabinets in kitchens, secondary baths and powder rooms are to have . . . [a] removable toe kick;

- Two pull out baskets underneath the kitchen sink and cook top;

- Furnish and install a lazy susan or half lazy susan where possible.

See Ital Subcontract, Art 4, ¶ 4.2 (DE# 166 at Exhibit B, 12/4/07).

**10.    Ital's Shop Drawings**

Ital began work on its shop drawings for Trump Tower II in December 2006.

JMAF provided Ted Platon, Ital's principal, with the following documents: the

architectural drawings for Trump Tower II, a CD containing the architect's AutoCAD[3]

files, appliance specifications and a set of the plaintiff's shop drawings.[4] Mr. Platon

gave these documents to Ital's senior designer Laura Rivas. Ms. Rivas looked at the

plaintiff's shop drawings before giving the documents to project designer Gustavo

Arrastia. Ms. Rivas and Mr. Arrastia were the only Ital designers who worked on the

Trump Tower project. Mr. Arrastia placed the documents he received for the project in a

binder.

Mr. Arrastia looked at the plaintiff's shop drawings. He noticed that the drawings

_____

[3] AutoCAD is a computer graphic program used to draw architectural plans.

[4] The plaintiff's shop drawings provided to Ital were not the same shop drawings that the plaintiff registered with the Copyright Office.

had elevations of the kitchen cabinets for units A through D and a floor plan view of the kitchens. Mr. Arrastia also noticed mistakes in the design and functionality of the kitchens in the plaintiff's drawings.

On December 11, 2006, JMAF had a site meeting with Ital to allow Ital to look at the sales center[5] and go through the scope of work in Ital's subcontract. Ms. Rivas and Mr. Arrastia attended the site meeting. They took pictures of the sales center model kitchen and bath and measured the total height of the cabinets and the appliances.

It took Mr. Arrastia a little over a week to create Ital's first set of shop drawings for Trump Tower II. It was not unusual for Mr. Arrastia to complete shop drawings within this short time frame. Mr. Arrastia was under a deadline to complete the shop drawings. The kitchens were small in most of the units and the kitchen layouts for the "B," "C" and "C" modified units were very similar.  Ital submitted its shop drawings to JMAF on December 20, 2006, a day or two after Mr. Arrastia finished them.

**11.    The January 17, 2007 Coordination Meeting**

JMAF reviewed Ital's first set of Trump Tower II shop drawings to determine whether they complied with the architectural drawings, the scope of work and the appliance package. JMAF knew there had been numerous revisions that had already been approved for the project and wanted to make sure Ital's shop drawings comported with these revisions. In reviewing Ital's shop drawings, JMAF noticed that the shop drawings differed in some respects from what had already been approved in the plaintiff's shop drawings. After reviewing Ital's shop drawings, JMAF set up a

---

[5] There was one sales center for all three towers. The cabinetry in the sales center was designed and installed by the plaintiff.

coordination meeting with the owner, the architect and Ital. JMAF wanted to go through Ital's shop drawings to make sure that the owner and the architect approved these differences.

At the January 17, 2007 coordination meeting, JMAF met with the owner, the architect and Ms. Rivas of Ital to discuss Ital's first set of shop drawings for Trump Tower II. The owner and the architect each had a set of the plaintiff's shop drawings. The owner, the architect and JMAF occasionally referred to the plaintiff's shop drawings to see how certain issues had been addressed and approved. The owner and the architect wanted to make sure any concerns that had already been addressed with the plaintiff's Trump Tower I shop drawings were not carried over to Trump Tower II.  Ms. Rivas was not provided with a copy of the plaintiff's shop drawings at the meeting. She may have looked at the plaintiff's drawings if the owner or the architect were referencing something on the plaintiff's shop drawings.

After the January 17, 2007 meeting, Ms. Rivas told Mr. Arrastia to make certain changes to Ital's shop drawings. Mr. Arrastia incorporated these changes into subsequent revisions of Ital's shop drawings. As a result, Ital's final shop drawings are more similar to the plaintiffs shop drawings than its first submittal.[6]

## 12.    The Plaintiff's Termination

JMAF became increasingly concerned with the plaintiff's ability to timely complete its work. On January 15, 2007, the plaintiff was supposed to start delivering

---

[6] Ital revised its shop drawings three or four times. Ital's final set of shop drawings were approved on March 14, 2007, almost three months after the first submittal.

and installing materials in the Trump Tower I building. On January 20, 2007, the plaintiff submitted a second Application and Certificate of Payment. The Application and Certificate of Payment was for materials in the amount of $359,216.24. JMAF wanted to verify that the materials listed in the Application and Certificate of Payment were in the plaintiff's warehouse before JMAF paid the amount requested. JMAF scheduled an inspection for January 24, 2007.

On January 23, 2007, the day before the scheduled inspection, the plaintiff submitted a sworn Affidavit of Stored Materials. In the affidavit, the plaintiff attested that the "[q]uantity, cost and value of [the] stored materials [were] as represented." According to the Application and Certificate of Payment, 65 percent of the materials for floors 6 through 14 were at the plaintiff's warehouse.

On January 24, 2007, JMAF's project executive Robert Nordling went to the plaintiff's warehouse to inspect the materials. Mr. Nordling did not see the materials for Trump Tower I at the warehouse. The plaintiff told Mr. Nordling that the materials were in another warehouse. When Mr. Nordling insisted on verifying the materials, the plaintiff told Mr. Nordling that the materials were at the Port of Miami and asked Mr. Nordling to return in two hours. Mr. Nordling returned on January 30, 2007. Mr. Nordling found 28 pallets of cabinet box material but not the materials that were represented in the Application and Certificate of Payment.

The plaintiff was terminated for convenience on February 19, 2007. At the time of termination, the plaintiff had installed cabinets in 13 or 14 units. JMAF removed these cabinets and replaced them with Ital's cabinets.

On February 20, 2007, JMAF received a letter from the plaintiff's counsel.[7] The letter did not request that JMAF return the plaintiff's shop drawings or even mention shop drawings. In this letter, the plaintiff expressed its concern with receiving payment for the project materials.

On March 7, 2007, the plaintiff registered its shop drawings as technical drawings with the United States Copyright Office. The plaintiff did not register its shop drawings until March 2007 because it wanted to wait until it had a final set of shop drawings. The plaintiff obtained a copyright registration for the sales center and a copyright registration for the units. Neither copyright registration states that the plaintiff based its shop drawings on the architectural plans.

The plaintiff's counsel sent a follow up letter to JMAF on March 9, 2007 concerning the materials for which the plaintiff expected payment. In this letter, the plaintiff did not request that its shop drawings be returned. The letter provides that "[i]f payment is not received by [a certain date, the plaintiff] will seek all remedies available to it under the contract and at law, including recording a claim of lien against the property." The shop drawings are not mentioned in the letter.

**13.    Ital's Subcontract for Trump Tower I**

Ital became a subcontractor for Trump Tower I on March 9, 2007. Ital's scope of work for Trump Tower I was the same as its scope of work for Trump Tower II and III. Pursuant to the subcontract, JMAF agreed to pay Ital $3,250,000.00 for work performed on Trump Tower I ($101,596.00 more than it had agreed to pay Dellacasa for this

---

[7] The February 20, 2007 and March 9, 2007 letters were prepared by the plaintiff's prior counsel who is not representing the plaintiff in the instant action.

project).  As a result of hiring Ital, JMAF had to pay some subcontractors additional money for revising their work to conform with Ital's cabinetry. JMAF received monetary claims from the plumber, the counter top subcontractor, the electrician and the drywall subcontractor. JMAF did not pay all the monetary claims because some of the work, such as the counter tops, could still be used for Trump Tower II and III.

**14.    Warehouse Meeting**

In April and May 2007, a meeting took place at the plaintiff's warehouse. The plaintiff wanted to sell its unused materials to JMAF. The purpose of the meeting was to quantify, verify and value the materials in the plaintiff's warehouse. JMAF also wanted to determine whether it could use the plaintiff's materials for Trump Tower III. At the time of the meeting, the materials that Ital had ordered for Trump Tower I and II were in production. Ital's principal, Ted Platon, was present at that meeting at JMAF's request. The plaintiff knew a representative from Ital would attend the meeting. JMAF wanted Ital to prepare a materials list and provide a valuation of the materials in the plaintiff's warehouse.

On April 25, 2007, the first day of the meeting, some of the pallets were inaccessible and some of the tags on the materials were earmarked for Harbour House, a different project. The plaintiff did not have bills of lading or packing lists. The meeting was reconvened on May 2, 2007. The plaintiff distributed a binder at that meeting as a tool to assist JMAF with valuating the materials in the plaintiff's warehouse. There were five or six copies of the binder at that meeting. The plaintiff provided one of those copies to Ital's president Ted Platon. The plaintiff's shop drawings were included in the binder.

18

Ital advised JMAF that Ital could only use a portion of the plaintiff's materials in completing its cabinetry work for Trump Tower III. With respect to the remaining materials, Ital advised JMAF that it would have to cut up and re-edge the plaintiff's materials which would be more expensive than ordering new materials from Italy. Some of the materials were the wrong size and the plaintiff's drilling patterns for hinges and assembly differed from Ital's system. Ultimately, JMAF did not buy the plaintiff's materials because the plaintiff and JMAF could not agree on the value of the materials.

Ital's cabinetry could not be installed using the plaintiff's shop drawings. Ital could not manufacture cabinets using the plaintiff's shop drawings because Ital's manufacturing process differed from the plaintiff's manufacturing process.

## 15.   Estimated Costs

If the preliminary injunction requested by the plaintiff were issued, the project would be delayed 10 to 12 months. The defendants would have to remove and destroy the existing cabinets for all 813 units. Ital would have to prepare new shop drawings. Once the shop drawings are finalized, the defendants would have to obtain a determination from the court or a special master that the new shop drawings do not infringe on the plaintiff's design. Ital's Italian manufacturer would have to manufacture cabinets based on the new drawings. The defendants would incur the cost of new materials, shipping, storage and overhead.

If the owner enforces the contract, JMAF would be subject to a $50 per unit penalty clause for each day after the scheduled completion date. JMAF would have to pay other subcontractors, including the counter top subcontractor, the electrician and the drywall contractor, to revise their work to conform with the new shop drawings.

19

JMAF could incur expenses in the amount of $9 to $11 million for Tower I and about $30 million for all three towers.

The owner would not be able to close on the units. At the time of Joyce Bronson's[8] testimony on January 8, 2008, 269 units were under contract in Tower I, 269 units were under contract in Tower II and 254 units were under contract in Tower III. The owner would also incur carrying costs totaling $50,700 per day for Trump Tower I, $28,000 per day for Trump Tower II and $29,000 per day for Trump Tower III based on real estate taxes, condo fees, insurance and personnel costs. The loans for all three towers mature in 2008. The owner would also have to refinance over $400 million in loans.

## STANDARD OF REVIEW

A preliminary injunction may be granted only if the moving party establishes four elements: (1) a substantial likelihood of success on the merits; (2) an immediate and irreparable injury absent injunctive relief; (3) a threatened harm to the plaintiff that outweighs any injury the injunction would cause to the nonmovant and (4) the injunction will not disserve the public interest. Carillon Importers v. Frank Pesce Int'l Group Ltd., 112 F.3d 1125, 1126 (11th Cir. 1997) (citation omitted). A preliminary injunction is "an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the 'burden of persuasion' as to the four [elements]." McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998) (citing All Care Nursing Serv., Inc. v. Bethesda Mem. Hosp., Inc., 887 F.2d 1535, 1537 (11th Cir. 1989)).

---

[8] Ms. Bronson is TRG's corporate representative.

## LEGAL ANALYSIS

### 1.      Subject Matter Jurisdiction

Federal jurisdiction in the instant case is premised solely on the plaintiff's

copyright infringement claim.  Ital argues that the plaintiff has failed to establish a <u>prima</u>

<u>facie</u> case for copyright infringement because it failed to show that Ital had access to

the final version of the plaintiff's shop drawings that were registered with the copyright

office. <u>See</u> Italkitchen International, Inc.'s Motion for Judgment on Partial Findings and

Incorporated Memorandum of Law (DE# 207 at 2, 1/4/08).  Thus, according to Ital, the

plaintiff is trying to maintain a copyright infringement action on an unregistered

copyright (the version of its shop drawings in Ital's possession). The registration of a

copyrighted work is a prerequisite to maintaining a claim of copyright infringement. The

Copyright Act provides that: "no action for infringement of the copyright in any United

States work shall be instituted until preregistration or registration of the copyright claim

has been made in accordance with this title." 17 U.S.C. § 411(a). Ital's argument is an

attack on this Court's subject matter jurisdiction.

The plaintiff argues that all prior versions of its shop drawings (including those in

Ital's possession) were subsumed in the final version of its shop drawings filed with the

Copyright Office. The plaintiff relies on <u>Streetwise Maps, Inc. v. Vandam, Inc.</u>, 159 F.3d

739 (2d Cir. 1998). In <u>Streetwise Maps, Inc. v. VanDam, Inc.</u>, 159 F.3d 739 (2d Cir.

1998), the plaintiff had published two Manhattan street maps. The later-published map

differed from the earlier map in that it included subway and bus lines. No copyright was

registered for the earlier map. The later map had been registered and the certificate of

registration indicated that it was derivative of the earlier map and listed the subway and bus lines as the newly added expressive elements. The defendants argued that the district court lacked subject matter jurisdiction to hear claims alleging that any aspects of the maps other than the drawings of the subway and bus lines had been copied. The Second Circuit rejected this argument holding that "because [the plaintiff] [wa]s the owner of the copyright of both the derivative and pre-existing work, the registration certificate relating to the derivative work . . . w[ould] suffice to permit it to maintain an action for infringement based on defendants' infringement of the pre-existing work." Id. at 747.

Ital correctly notes that unlike Streetwise, the plaintiff's Certificate of Registration lists only the sales center (and not prior versions of its shop drawings) as the pre-existing work. The plaintiff argues that prior versions of its shop drawings are subsumed in its final registered set of shop drawings because the shop drawings attached to its Certificate of Registration contain a revision history in which prior revision dates are referenced. See Plaintiff's Surreply Memorandum of Law to Ital's Motion for Judgment on Partial Findings (DE# 221, 1/18/08). The plaintiff further notes that the argument advanced by Ital "would lead to the absurd conclusion that every author of a work would need to register all prior drafts of their works in order to extend protection over the earlier drafts." Id.

The undersigned finds that, if the plaintiff has a valid copyright, all prior versions of the plaintiff's shop drawings for Trump Tower I would be subsumed in the plaintiff's certificate of registration. As such, the Court has subject matter jurisdiction over the

instant copyright infringement action. In <u>Streetwise</u> the maps at issue were finalized products that had already been placed in the stream of commerce. As such, <u>Streetwise</u> required that to maintain a copyright infringement action over a preexisting work, the plaintiff would have to either register that work or disclose the preexisting work in the certificate of registration of a subsequent (derivative work). In the instant case, as with many products, shop drawings are developed through an evolutionary process requiring numerous revisions. Ital obtained access to the plaintiff's shop drawings before the plaintiff prepared its final set of shop drawings. Under Ital's argument, the plaintiff would have to list all prior drafts of its shop drawings on its certificate of registration. The undersigned finds that such a requirement would be unreasonable.

**2.    Preliminary Injunction**

 **a.    Substantial Likelihood of Success on the Merits**

  Substantial likelihood of success on the merits requires an analysis of the plaintiff's ability to make a showing of each of the required elements of the claims asserted. <u>See</u> <u>Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.</u>, 188 F. Supp. 2d 1350, 1353-55 (S.D. Fla. 2002).  The plaintiff seeks a preliminary injunction with respect to its copyright infringement claim. <u>See</u> Plaintiff's Verified Motion for Preliminary Injunction (DE# 2, 6/28/07). To establish a <u>prima</u> <u>facie</u> case of copyright infringement, the plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991).

### i.      Ownership of a Valid Copyright

The ownership and validity of the plaintiff's copyright are at issue. The plaintiff argues that it has satisfied the ownership element of copyright infringement because it is the author of the shop drawings and registered its shop drawings.[9] "In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c).[10] The defendants counter that the plaintiff cannot be the owner of a valid copyright  because TRG is the owner of the copyrighted shop drawings under the general contract.

The undersigned finds that the language of the subcontract between the plaintiff and JMAF incorporates by reference the general contract between TRG and JMAF. The subcontract between JMAF and Dellacasa states, in pertinent part, that:

> The Contract Documents for this Subcontract consist of this Agreement and any Exhibits attached hereto, **the Agreement between the Owner and Contractor dated as of 7/18/2005**, the Conditions of the Contract between the Owner and Contractor (General, Supplementary, and other Conditions), the Drawings, the Specifications, all addenda issued prior to and all Modifications issued after execution of the Agreement between the Owner and Contractor and agreed upon by the parties to this subcontract. **These form the Subcontract, and are as fully a part of the Subcontract as if attached to this Agreement or repeated herein** (except as otherwise specified in Article 13 hereof).

---

[9] The plaintiff has withdrawn its claim of copyright infringement for the sales center shop drawings. As such, the only remaining claim of infringement is for the shop drawings of the building, registration no. VAu731-508.

[10] This rebuttable presumption satisfies the requirement of originality and susceptibility to copyright. Arthur Rutenberg Corp. v. Dawney,  647 F. Supp. 1214 (M.D. Fla.1986).

See Dellacasa Subcontract, Art I, ¶ 1.1 (DE# 162 at Exhibit 1, 12/4/07) (emphasis added).

In the instant case, Florida law governs the interpretation of the subject contracts. The Florida Supreme Court has recognized that "where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." OBS Co., Inc. v. Pace Const. Corp., 558 So. 2d 404, 406 (Fla. 1990). In OBS, the Florida Supreme Court found that the following language was sufficient to incorporate the terms of the general contract into the subcontract:

> The Contract Documents for this Subcontract consist of this Agreement and any Exhibits attached hereto, the Agreement between the Owner and Contractor on this Project, the conditions of the Contract between the Owner and Contractor (General Supplementary and other Conditions), Drawings, Specifications, all Addenda issued prior to execution of the Agreement between the Owner and Contractor, and all Modifications issued subsequent thereto. With respect to its work, **Subcontractor agrees to be bound to the Contractor by all the items of the Agreement between the Contractor and the Owner and by the Contract Documents and to assume toward the Contractor and the Owner all of the obligations and the responsibilities that the Contractor by those instruments assumes toward the Owner**. Subcontractor has reviewed and inspected the Contract Documents.

Id. (emphasis added). As in OBS, the language of the subcontract between JMAF and the plaintiff is sufficient to incorporate by reference the general contract.

The plaintiff also argues that it cannot be bound by the general contract because JMAF failed to attach a copy of the general contract to the subcontract or otherwise provide the plaintiff with a copy of the general contract. The plaintiff relies on Gustavsson v. Washington Mutual Bank, 850 So. 2d 570 (Fla. 4th DCA 2003). In

25

Gustavsson, the bank sent the plaintiff (hereinafter "bank customer") a facsimile including the front page of a bank signature card but not the reverse side. The bank customer signed the document and returned it. After a dispute arose between the bank customer and the bank, the bank sought to enforce an arbitration provision contained in the bank's disclosure statement. The reverse side of the bank card contained language incorporating by reference the disclosure statement. The court found that the bank could not enforce the arbitration provision because the bank customer did not have notice of the incorporation of the disclosure statement. "Since the [b]ank did not refer to arbitration, or expressly refer and sufficiently describe another document containing an arbitration requirement, it cannot now ask [the court] to put in a term and condition when it failed to do so and to which [the bank customer] did not assent." Id. at 574.

The undersigned finds that Gustavsson is distinguishable from the instant case. Unlike the bank customer in Gustavsson who did not receive a copy of the document containing the language incorporating another document, the first paragraph of the subcontract signed by the plaintiff clearly states that the general contract became part of the subcontract and was "as fully a part of the Subcontract as if attached to this Agreement or repeated [t]herein."

The instant case is more akin to Schofield v. French, 36 F. Supp. 2d 481, 486 (D. R.I. 1999). In Schofield, the court found that a valid transfer of a copyright had occurred even if the party was not provided with a copy of the agreements transferring copyright ownership noting that the "[e]xplicit reference in the contract to [other] documents puts reasonable people on notice that they should read it and know the

26

terms. . . . [A] reasonable person would **know without a doubt** that he was agreeing to abide by the Consulting Agreements, and if [the defendant] signed the contract without examining the incorporated documents, then he did so at his own risk." Id. (emphasis in original).

As in Schofield, the plaintiff was placed on notice that the general contract between JMAF and the owner dated July 18, 2005 "[was] as fully a part of the Subcontract as if attached to this Agreement or repeated [t]herein." See Dellacasa Subcontract, Art I, ¶ 1.1 (DE# 162 at Exhibit 1, 12/4/07). The plaintiff is a sophisticated business entity who was represented by counsel at the time it entered into the subcontract. The plaintiff's corporate counsel understood that the plaintiff would be bound by the general contract since she wanted to ensure that if there was a conflict between the general contract and the subcontract, that the terms of the subcontract would prevail. The undersigned further notes that the parties had a longstanding business relationship and had entered into similar contracts in the past.

### ii.    Transfer of Copyright Ownership

The plaintiff further argues that any transfer of copyright ownership is invalid because it fails to comply with 17 U.S.C. § 204(a). Section 204(a) is akin to the statute of frauds in that its purpose is to protect the author of copyrighted material from mistaken or fraudulent claims of oral transfer. Imperial Residential Design v. The Palms Dev. Design, Inc., 70 F.3d 96, 99 (11th Cir. 1995). Section 204(a) states that "[a] transfer of copyright ownership . . . is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights

conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). "No magic words

must be included in a document to satisfy § 204(a). Rather, the parties' intent as

evidenced by the writing must demonstrate a transfer of the copyright." Radio

Television Espanola, S.A. v. New World Entertainment, Ltd., 183 F.3d 922, 927 (9th

Cir. 1999) (citing 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, §

10.03[A][2] at 10-37).

The language in the general contract is sufficient to transfer copyright ownership

in the plaintiff's shop drawings to TRG. The general contract between TRG and JMAF

states, in pertinent part:

> The Drawings, Specifications, and other similar or related documents and
> copies thereof are furnished to the Contractor for the purpose of
> performing the Work and are, and shall remain, the property of the Owner.
> Neither the Contractor nor any Subcontractor, or material or equipment
> supplier shall own or claim a copyright in the Drawings, Specifications,
> and other similar or related documents, and **Owner will retain all
> common law, statutory, and other reserved rights, in addition to the
> copyright (including, without limitation, the right to create derivative
> works therefrom)**. All copies of such documents shall be returned to the
> Owner upon Completion of the Work.

See General Contract, ¶ 1.1 (DE# 162 at Exhibit 2, 12/4/07) (emphasis added). The

terms "drawings" and "specifications" are defined by the general contract. Paragraph 2

of the general contract states that: "Drawings, which are identified in Exhibit 1-A to the

Agreement, and which have been signed by the parties as of the date hereof (such

Drawings as the same may be further revised from time to time with the approval of the

parties hereto are herein referred to as 'Drawings' . . . )." Id. at  ¶ 2. Exhibit 1-A is

followed by a list of drawings by various disciplines including the architectural, civil,

mechanical, plumbing and structural. The undersigned agrees with the plaintiff that the plaintiff's shop drawings are not included in this list. Thus, the plaintiff's shop drawings do not fall under the definition of "Drawings" in the general contract.

The undersigned finds that the plaintiff's shop drawings are "specifications" or, at the very least, "other similar or related documents"[11] under by the general contract. The general contract provides that "[s]pecifications, which are identified in Exhibit 1-B to the Agreement, the first and last pages of which have been signed by the parties as of the date hereof (such Specifications, as the same may be further revised from time to time with the approval of the parties hereto are herein referred to as 'Specifications' . . . )." Id. at ¶ 3. Exhibit 1-B lists "Kitchen C[a]binets/Bathroom Vanities" as specifications and is followed by the appliance package and the plaintiff's May 2, 2005 proposal. When "Kitchen C[a]binets/Bathroom Vanities" are read into paragraph 1.1 it is clear that Exhibit 1-B is referring to the shop drawings: "[t]he Drawings, ["Kitchen Cabinets/Bathroom Vanities"] and other similar or related **documents and copies** thereof are furnished to the Contractor for the purpose of performing the Work and are, and shall remain, the property of the Owner." (emphasis added). It is undisputed that the plaintiff's shop drawings were furnished to JMAF "for the purpose of performing the Work" the plaintiff was hired to do.

The undersigned further finds that the parties' intent to transfer the copyright is clear: "[n]either the Contractor nor any Subcontractor, or material or equipment supplier

---

[11] The phrase "other similar or related documents" is not defined by the general contract but should be read to mean documents that are similar or related to the Drawings and Specifications.

shall own or claim a copyright in the Drawings, Specifications, and other similar or related documents, and Owner will retain all common law, statutory, and other reserved rights, in addition to the copyright (including, without limitation, the right to create derivative works therefrom)." <u>See</u> General Contract, ¶ 1.1 (DE# 162 at Exhibit 2, 12/4/07).

The plaintiff cites to the actions of the parties, presumably because it contends that the general contract is ambiguous. <u>See</u> <u>Wheeler v. Wheeler, Erwin & Fountain, P.A.</u>, 964 So. 2d 745 (Fla. 1st DCA 2007) (noting that the intent of the parties to an unambiguous contract must be determined from the four corners of the document without resorting to extrinsic evidence). Even assuming that the general contract is ambiguous, which the undersigned does not find, the plaintiff does not fare any better when considering the actions of the parties.

On October 25, 2006, the plaintiff submitted an Application and Certificate for Payment to JMAF which included a request for $30,000.00 for shop drawings. JMAF paid the amount requested ($30,000.00) minus a 10% retainage for a total of $27,000.00. Following its termination, the plaintiff sent letters to JMAF seeking to have JMAF purchase  the plaintiff's materials to use on the project. In these letters, the plaintiff did not request that JMAF return its shop drawings or advise JMAF that it could not use the shop drawings. At the warehouse meeting, the plaintiff was interested in selling its materials to JMAF. It did not object to the presence of Ital, a direct competitor, at the meeting and even provided Ital with a binder containing its shop drawings. It was only after JMAF declined to purchase the plaintiff's materials that the plaintiff advised

JMAF, through counsel, that it was in violation of the plaintiff's copyright.

According to the plaintiff, TRG did not act like the owner of the plaintiff's shop drawings. After terminating the plaintiff, TRG removed and destroyed the cabinets that had been installed by the plaintiff and returned the drawings. According to the plaintiff, if TRG owned the shop drawings it would have hired an installer to install the cabinetry instead of hiring Ital to prepare new shop drawings. The defendants presented credible evidence that Ital could not work from the plaintiff's shop drawings and that Ital's manufacturing and assembly process was different from the plaintiff's. As such, Ital would have to, at the very least, revise the plaintiff's shop drawings so that its manufacturing plant in Italy could produce the cabinetry. Notably, the plaintiff's own expert, an experienced kitchen designer, admitted that in his practice, the client was the owner of the shop drawings.

Although the plaintiff's Certificate of Registration constitutes prima facie evidence of the validity of the copyright and of the facts stated in the certificate, the defendants have presented ample credible evidence rebutting the presumption that the plaintiff is the owner of the registered shop drawings. Thus, the undersigned finds that the plaintiff has not shown a substantial likelihood of success on the merits.[12]

**b.    Irreparable Harm**

The parties dispute whether irreparable harm can be presumed at the

---

[12] The plaintiff met its burden of proving that Ital's shop drawings were substantially similar to the plaintiff's registered shop drawings. However, the plaintiff is unable to show a substantial likelihood of success on the merits of its copyright infringement claim because the plaintiff transferred ownership of its shop drawings to the owner through the general contract.

preliminary injunction stage in a copyright case in light of the Supreme Court's decision in Ebay, Inc. v. Mercexchange, LLC, 126 S.Ct. 1837 (2006). In Ebay, the Supreme Court held that in a patent case irreparable harm was no longer presumed in determining whether to issue a permanent injunction. The undersigned does not need to decide whether irreparable harm is presumed because the plaintiff did not show a substantial likelihood of success on the merits.  See R. Miller Architecture, Inc. v. Edgington Enterprises, Inc., 06-cv-871, 2006 WL 2226297, *8 (M.D. Fla. Aug. 2006) (irreparable harm presumption inapplicable where plaintiff did not show likelihood of success on the merits).

The undersigned finds that the plaintiff cannot show irreparable harm. In Concrete Machinery Co., the court recognized that:

> copyright protects the unique and somewhat intangible interest of creative expression. Unlike most property rights, the value of this interest is often fleeting. The popular demand for a new literary, musical, sculptural or other 'work of authorship' . . . often may last only until the next fad. . . . In such situations, the commercial value of the copyright owner's tangible expression, appropriated by an infringer, may be lost by the time litigation on the claim is complete. . . . [M]onetary recovery at that point may be inadequate to redress the harm.

Concrete Machinery Co., v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 611 (1st Cir. 1988) (internal citations omitted).

In the instant case, the commercial value of the plaintiff's shop drawings is not fleeting. Unlike architectural drawings which, presumably, can be resold to another builder or prospective home owner, there is no market for the plaintiff's shop drawings outside of the Trump Tower project. It is undisputed that the plaintiff's shop drawings

were prepared based on the dimensions, layout and specifications unique to the Trump Tower project and cannot be used on any other project. Thus, the concern that generally underlies the issuance of preliminary injunctive relief in copyright infringement cases, fleeting damages, is not present here.

Monetary damages are sufficient to compensate the plaintiff if it ultimately prevails on its copyright infringement claim. The plaintiff entered into a contract with JMAF which placed a value on the plaintiff's work, including its shop drawings. Thus, the value of the plaintiff's shop drawings can be determined from the contract. The undersigned does find that the plaintiff incurred substantial costs in purchasing the materials for the project. However, these damages are not irreparable. "To the extent that [the plaintiff] will suffer monetary harm from the infringement of its copyright, harms that may be remedied through the award of monetary damages are not considered 'irreparable.'" Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1276 (11th Cir. 2001).

The plaintiff also argues that by copying the plaintiff's product and design, Ital has gained in its market share at the plaintiff's expense. The only evidence of lost market share presented by the plaintiff is the loss of the Trump Tower I project. There is ample evidence that the reason the plaintiff lost the Trump Tower I contract was because JMAF was concerned with the shortage of materials in the plaintiff's warehouse. JMAF had worked on prior projects with the plaintiff where the plaintiff had not finished the work it was contracted to do. Ital had already been hired as the cabinetry subcontractor for Trump Tower II and III when the plaintiff was terminated.

The plaintiff also claims it has been damaged in the eyes of other tradesmen and that Ital's products are of inferior quality. However, tradesmen are not the plaintiff's market. There is no credible evidence that Ital's products are not of the same quality as the plaintiff's or that Ital employs shoddy workmanship. To the extent that the plaintiff has shown harm, this harm is not irreparable and may be remedied through an award of monetary damages.

     **c.    Balancing of Harms**

The harm the defendants would sustain if a preliminary injunction were issued far outweighs the harm the plaintiff would sustain if the defendants were not enjoined. Although the courts generally will not give significant weight to the harm inflicted upon an infringer, <u>C.B. Fleet Co., Inc., v. Unico Holdings, Inc.</u>, 510 F. Supp. 2d 1078, 1083 (S.D. Fla. 2007), the plaintiff has not shown that it is likely to prevail on its claim that the defendants infringed its copyright.

If a preliminary injunction were issued, the delay in the project would be 10 to 12 months. The defendants would have to remove and destroy the existing cabinets for all 813 units. Ital would have to prepare new shop drawings. These shop drawings may have to be revised several times. Once the new shop drawings are finalized, the defendants would have to go through the court or a special master to ensure that the new shop drawings do not infringe on the plaintiff's shop drawings. Ital would have to order new cabinets which are manufactured and shipped from Italy. The defendants would incur costs for overhead, new materials, shipping and storage fees.

The costs to JMAF would be significant. JMAF would have to pay the plumber,

the counter top subcontractor, the electrician and the drywall subcontractor to modify their work to fit with the new shop drawings. If the general contract terms are enforced, JMAF would be subject to a $50 per unit penalty clause for each day after the scheduled completion date.  In total, JMAF could incur fees and costs in the amount of $9 to $11 million for Tower I and about $30 million for all three towers.

The owner would not be able to close on the units until new cabinetry is installed. The owner would likely be subject to litigation from unsatisfied buyers and could lose the contracts on the units.[13] The carrying costs for the owner would also be significant. The real estate taxes, condo fees, insurance and personnel costs total $50,700 per day for Trump Tower I, $28,000 per day for Trump Tower II and $29,000 per day for Trump Tower III. If the owner is unable to close on the units, the owner would have to refinance over $400 million in loans for all three towers.

The damage to the plaintiff if a preliminary injunction is not issued pales in comparison. The plaintiff has incurred a loss of approximately $2 million in materials. The plaintiff argues that "the irreparable harm caused to [the plaintiff] lies in the fact that JMAF improperly distributed [the plaintiff's shop drawings] to Ital so that Ital could create knock-off cabinetry for the entire Trump Project." Plaintiff's Reply Memorandum of Law in Further Support of Plaintiff's Motion for Preliminary Injunction (DE# 91 at 15, 10/15/07).  Having found that the plaintiff has not shown a substantial likelihood of prevailing on the merits of its copyright infringement claim, the undersigned does not

--------

[13] At the preliminary injunction hearing, 269 units were under contract in Tower I, 269 units were under contract in Tower II and 254 units were under contract in Tower III.

give much weight to this claimed harm. The plaintiff also argues that it has developed a reputation for high-end Italian design and has devoted substantial resources to creating its shop drawings. See Plaintiff's Motion for Preliminary Injunction and Incorporated Memorandum of Law (DE # 2 at 14, 6/27/07). According to the plaintiff, Ital's products "are being confused with [the] plaintiff's products and are of inferior quality." Id. at 13. The plaintiff has not presented any credible evidence concerning the inferior quality of Ital's shop drawings. Even if Ital's products and the plaintiff's products are of the same quality, the plaintiff could still be harmed if the intended consumer of the product was confused. See C.B. Fleet Co., Inc., v. Unico Holdings, Inc., 510 F. Supp. 2d 1078, 1083 (S.D. Fla. 2007). However, the plaintiff did not present evidence that Ital's products were being confused for the plaintiff's products or that it has lost jobs (other than Trump Tower I) as a result of Ital purportedly using its copyrighted shop drawings.

Based on the evidence presented in the instant case, the balance of harms weighs against the issuance of a preliminary injunction.

### d.    Public Interest

In the instant case, the issuance of an injunction would disserve the public interest. The plaintiff has not shown a substantial likelihood of prevailing on the merits of its copyright infringement claim. The public interest in preventing copyright infringement is not present here and the delay in the project would cause significant harm to the unit owners. Courts have also recognized a public interest in enforcing contracts.

## **CONCLUSION**

The plaintiff's Certificate of Registration provides <u>prima</u> <u>facie</u> evidence of the validity of its copyright and of the facts stated on the certificate. The defendants have rebutted this presumption. The subcontract between JMAF and the plaintiff incorporated by reference the general contract. Under the general contract, TRG was the owner of the plaintiff's shop drawings. The plaintiff is unable to show a substantial likelihood of success on the merits of its copyright infringement claim, that it has suffered an irreparable harm, that the balancing of harms favors the issuance of an injunction or that the issuance of an injunction would not disserve the public interest. The Plaintiff's Motion for Preliminary Injunction and Incorporated Memorandum of Law (DE # 2, 6/27/07) is **DENIED**.

DONE AND ORDERED in Chambers, at Miami, Florida, this **1st** day of February, 2008.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
District Court Judge Gold
All counsel of record